IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| RAYMOND M., JACQUE M., and AMANDA M., <br><br>        Plaintiffs, <br><br> v. <br><br> BEACON HEALTH OPTIONS, INC. and CHEVRON MENTAL HEALTH AND SUBSTANCE ABUSE PLAN, <br><br>        Defendants. | **MEMORANDUM DECISION AND ORDER** <br><br> Case No. 2:18-cv-048-JNP-EJF <br><br> District Judge Jill N. Parrish <br><br> Magistrate Judge Evelyn J. Furse |

This action arises under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, *et. seq*, and is before the court on the parties' cross-motions for summary judgment. Defendants Beacon Health Options, Inc. ("BHO") and Chevron Mental Health and Substance Abuse Plan (collectively, "Defendants") and Plaintiffs Raymond M., Jacque M., and Amanda M. ("Amanda") (collectively, "Plaintiffs") both moved for summary judgment on March 11, 2019. Having considered the parties' briefs, the court denies Defendants' Motion for Summary Judgement (ECF No. 24) and grants in part and denies in part Plaintiffs' Motion for Summary Judgment (ECF No. 27).

## I.  BACKGROUND

This dispute involves the denial of benefits allegedly due to Plaintiffs under their ERISA employee group health benefit plan entitled the Chevron Mental Health and Substance Abuse Plan ("the Plan"). Chevron Corporation is the Plan Sponsor and Plan Administrator. BHO is the named fiduciary and designated Claims Administrator of the Plan. *See* REC 0044, 0054, 0160, 0173.[1]

---

[1] The administrative record indicates the bates stamped pages using "BHO" and the corresponding page number. *See generally* ECF Nos. 25, 31. Instead of using this naming convention, the court

Accordingly, BHO has discretionary authority to interpret the Plan provisions, set coverage criteria consistent with the Plan, and make decisions regarding specific claims for benefits and appeals of benefits denials. REC 0038, 0154. Raymond M. is the Plan participant and his daughter, Amanda, is a Plan beneficiary. Compl. ¶ 2.

Plaintiffs sought care for Amanda's mental health and substance abuse conditions at a Residential Treatment Center ("RTC") called New Haven. BHO provided benefits for approximately one month of Amanda's treatment at New Haven, but denied benefits for approximately nine months of her subsequent treatment. Plaintiffs contend that BHO's denial of benefits caused them to pay over $100,000 in unreimbursed, out-of-pocket expenses. *Id*. ¶ 66.

## A. THE PLAN AND BHO'S MEDICAL NECESSITY CRITERIA

The Plan offers benefits for medically necessary mental health and/or substance abuse care at an RTC, *see, e.g.*, REC 0019, 0021, 0025, 0027, 0031, 0033, and classifies residential treatment as a subacute level of care, *see* REC 0087. Specifically, it defines residential treatment as "24-hour residential care" that "provides structured mental health or substance abuse treatment" for "patients who don't require acute care services or 24-hour nursing care." *Id.* This definition is in contrast to what the Plan recognizes is the higher level of care for mental health and substance abuse conditions: "acute inpatient treatment." *See* REC 0019, 0021, 0025, 0027, 0031, 0033. In general, the Plan excludes coverage for "services that aren't considered medically necessary." REC 0036, 0150. The Plan defines medically necessary services as those:

- Intended to prevent, diagnose, correct, cure, alleviate or preclude deterioration of a diagnosable condition (ICD-9 or DSM-IV) that threatens life, causes pain or suffering or results from illness or infirmity.
- Expected to improve an individual's condition or level of functioning.

cites the record using "REC" and the corresponding record page number because the court uses BHO as an abbreviation for the claims administrator in this case.

- Individualized, specific and consistent with symptoms and diagnosis and not in excess of patient's needs.
- Essential and consistent with nationally accepted standard clinical evidence generally recognized by mental health or substance abuse care professionals or publications.
- Reflective of a level of service that is safe, where no equally effective, more conservative and less costly treatment is available.
- Not primarily intended for the convenience of the recipient, caretaker or provider.
- No more intensive or restrictive than necessary to balance safety, effectiveness and efficiency.
- Not a substitute for non-treatment services addressing environmental factors.

REC 0086, 0213. The Plan also states that "[e]ven though a clinician may prescribe, order, recommend or approve a service or supply, it doesn't mean that it's medically necessary.  [BHO] . . . determines if a service or supply is medically necessary." REC 0086, 0213.

Under its delegated authority to interpret the Plan and develop claims administration criteria, *see* REC 0038, 0154, BHO uses two sets of medical necessity criteria to make benefits decisions for RTC treatment. First, BHO's admissions criteria for RTC treatment requires claimants to meet all of the following:

(1) DSM or corresponding ICD diagnosis and must have mood, thought, or behavior disorder of such severity that there would be a danger to self or others if treated at a less restrictive level of care.
(2) Member has sufficient cognitive capacity to respond to active acute and time limited psychological treatment and intervention.
(3) Severe deficit in ability to perform self-care activity is present (i.e. self-neglect with inability to provide for self at lower level of care).
(4) Member has only poor to fair community supports sufficient to maintain him/her within the community with treatment at a lower level of care.
(5) Member requires a time limited period for stabilization and community re-integration.
(6) When appropriate, family/guardian/caregiver agree to participate actively in treatment as a condition of admission.
(7) Member's behavior or symptoms, as evidenced by the initial assessment and treatment plan, are likely to respond to or are responding to active treatment.
(8) Severe comorbid substance use disorder is present that must be controlled (e.g., abstinence necessary) to achieve stabilization of primary psychiatric disorder.

3

REC 0398–99. Second, BHO's continued care criteria for RTC treatment requires claimants to

meet all of the following:

> (1) Member continues to meet admission criteria;
> (2) Another less restrictive level of care would not be adequate to provide needed containment and administer care
> (3) Member is experiencing symptoms of such intensity that if discharged, would likely be readmitted;
> (4) Treatment is still necessary to reduce symptoms and improve functioning so member may be treated in a less restrictive level of care.
> (5) There is evidence of progress towards resolution of the symptoms causing a barrier to treatment continuing in a less restrictive level of care;
> (6) Medication assessment has been completed when appropriate and medication trials have been initiated or ruled out.
> (7) Member's progress is monitored regularly and the treatment plan modified, if the member is not making progress toward a set of clearly defined and measurable goals.
> (8) Family/guardian/caregiver is participating in treatment as clinically indicated and appropriate or engagement is underway.
> (9) There must be evidence of coordination of care and active discharge planning to: (a) transition the member to a less intensive level of care; (b) operationalize how treatment gains will be transferred to subsequent level of care.

*Id*.

## B. AMANDA'S CONDITION

Amanda has long struggled with mental health and substance use disorder conditions. She

has endured numerous traumatic experiences, including witnessing her birthmother's suicide by

hanging when Amanda was four years old. REC 1516. Amanda had rope burns and bruises around

her neck, indicating that her birthmother also intended to hang Amanda. *Id.* Two years after this

tragedy, Amanda's father, Raymond M., married Jacque M., who later legally adopted Amanda.

*Id.* In 2009, the family moved to Ririe, Idaho, but Amanda had difficulties with the changed

environment and had strained relationships with school peers and her family. *Id*. During this time,

she began to experiment with drugs and alcohol, became withdrawn, and engaged in other risky

behaviors such as sneaking out of the home for extended periods. REC 1516–17. This prompted

Plaintiffs to seek weekly outpatient psychiatric counseling for Amanda, which she attended on and off. REC 1517.

In 2013, when Amanda was thirteen years old, her parents discovered that she was self-harming by cutting her wrists and arms. *Id.* On one occasion, Amanda's self-harm was so severe that her parents had to take her to the emergency room for stitches. *Id.* Soon after this incident, Plaintiffs admitted Amanda to the Eastern Idaho Regional - Behavioral Health Center for inpatient acute care ("BHC"), where she was diagnosed with Major Depressive Disorder, Posttraumatic Stress Disorder, Oppositional Defiant Disorder, Parent-Child Relational Problem, and Borderline Personality Disorder. REC 1553.

After Amanda's time at BHC, Plaintiffs again arranged for a program of outpatient counseling that Amanda attended intermittently. REC 1517. But she continued to experience turbulence in her academic and social life, and outpatient therapy again proved ineffective to help Amanda manage her mental health and substance abuse struggles. *Id.* After Amanda told her outpatient therapist, Shaylene Peninger, that she did not feel safe and that she may hurt herself again, Plaintiffs readmitted Amanda to BHC's inpatient acute care unit on November 17, 2014. REC 1518. Subsequently, Plaintiffs transferred Amanda to a different acute-level care center at the Teton Peaks-Residential Treatment Unit ("Teton") on November 24, 2014. *Id.* At Teton, Amanda's treating psychologists confirmed many of her diagnoses from BHC and added her increasingly challenging alcohol and narcotics use disorders. REC 1556. Amanda remained at Teton until January 20, 2015, and was discharged because her insurance claims administrator—a predecessor company to BHO—declined to cover her continued treatment. REC 1518.

After her discharge from Teton, Amanda restarted outpatient treatment with Ms. Peninger and showed initial signs of gradual improvement, but she returned to her dangerous habits of

sneaking out of the house, abusing alcohol and drugs, stealing pills, and engaging in risky behaviors such as drinking and driving. *Id.* After one instance in August 2015, Amanda had to be taken to the emergency room after she claimed that she had attempted to overdose on pills. REC 1519. And in November 2015, Amanda had an especially severe altercation with Jacque M., which caused Amanda to run away from home for several days. *Id.* When police found her, Amanda was held in juvenile detention and charged with running away and battery. *Id.*

At this point, Ms. Peninger recommended that Amanda receive "[a] higher level of care" to "ensure that she receive more intensive treatment and structure" because "outpatient treatment is not able to give her the amount of care that she needs at this time." REC 1566. Ms. Peninger reached this conclusion because she observed that Amanda's "symptoms associated with depression and PTSD" had become "exacerbated . . . over the past few months," including "increases in self-harm (cutting on her legs), and impulsive behaviors (running away from home for days at a time without contacting family or having a place to stay)." *Id.* Plaintiffs also conferred with an educational consultant, Christie Campbell, about the proper treatment plan for Amanda and Ms. Campbell recommended an RTC, among other care options. REC 1519, 1568. Moreover, as part of her criminal adjudication arising from the November 2015 incident, Amanda was required to meet with Michael Guymon, a licensed clinical social worker working for the State of Idaho. REC 1574. After evaluating Amanda's symptoms and her records, Mr. Guymon reinforced many of Amanda's diagnoses and "endorsed" the family's plan to enroll her in an RTC program "as viable to address [her] needs." REC 1582–83.

### C.  NEW HAVEN TREATMENT

Plaintiffs admitted Amanda to the RTC program at New Haven on December 21, 2015. REC 2645. New Haven is a licensed, all-girls residential treatment facility under Utah Law and its

treatment team includes a psychiatrist, a psychiatric/mental health nurse practitioner, a registered nurse, licensed clinical social workers, and other licensed therapists. ECF No. 38 at 15. Upon her admission, clinical psychologist Dr. Brett Merrill conducted three psychological evaluations of Amanda between December 22, 2015, and February 1, 2016. *See* REC 3938. Dr. Merrill documented Amanda's symptoms concerning her depression, anxiety, trauma, and substance abuse conditions, among other observations. REC 3938–47. Overall, Dr. Merrill concluded that "residential treatment is warranted and recommended," and because of her underlying conditions and the severity of her symptoms, "Amanda's suicidal ideation and self-harming behaviors should be carefully monitored," as well as "[h]er perceptions and behaviors toward drugs." REC 3946. Amanda's treatment team at New Haven noted that she "presented with a very low sense of self-worth and lack of insight around her identity and role in her family and social with peers," and that she has "coped with her depressive and anxious feeling through acting out, self-harm, or substance use." REC 2649–50.

On January 16, 2016, the New Haven treatment team developed a Master Treatment Plan for Amanda that identified her diagnoses and treatment objectives. REC 3931. The treatment plan listed Amanda's diagnoses as "Depressive Disorders," "Substance Use and Addictive Disorders," "Disruptive, Impulse Control and Conduct Disorders," "Personality Disorders," and "Trauma and Stressor Related Disorders." *Id.* To address these diagnoses, New Haven offered Amanda a variety of treatments, including individual therapy, group therapy, family therapy, recreational therapy, and community service-based therapy. *See generally* REC 2643–3937. On October 21, 2016, New Haven discharged Amanda after she completed the RTC program. REC 2645.

### D.   BHO's Denial of Benefits

When Plaintiffs admitted Amanda to New Haven, New Haven staff contacted BHO to obtain benefits for RTC services and a BHO reviewer authorized ten days of coverage for "short term stabilization." REC 0224. On December 30, 2015, New Haven requested further authorization for Amanda's continued RTC care and BHO authorized five additional days, but BHO requested more information on her treatment plan, discharge readiness, and medication plan. *Id.* On January 4, 2016, New Haven again requested further authorization of benefits and BHO authorized an additional week of coverage. REC 0223. On January 11, 2016, New Haven requested additional authorization for RTC services and BHO provided authorization. *Id.*

On January 16, 2016, the treating team at New Haven developed the Master Treatment Plan for Amanda and three days later made a final request to BHO for further coverage authorization. REC 3931, 0222. But when BHO approved benefits on January 11, it also internally noted that it should "prepare [Amanda] for step down to [lower level of care]" and would communicate "likely denial on next review." REC 0223. Accordingly, BHO sent Plaintiffs a letter dated January 25, 2016, informing them that BHO was denying benefits for Amanda's treatment at New Haven from January 19 forward. REC 0346. BHO determined that RTC care was no longer "medically necessary" for Amanda's condition and symptoms, based on its internal criteria interpreting the Plan. *Id.* The denial letter stated:

> You are a 16 year old female admitted to a mental health residential program on 12/21/15 and have received psychotherapy and medications including Abilify and Celexa. As of 1/19/16, your presenting symptoms have significantly resolved. You are cooperative with and motivated for treatment, take medications as prescribed, are actively participating in therapy, and have no intent or plan for self-harm. You are not aggressive, oppositional, or defiant, and are able to attend to your self-care needs. As of 1/19/16, medical necessity for continued residential treatment cannot be

validated. You can appropriately be treated at the outpatient mental
health level of care.

*Id*.

Plaintiffs filed a level one appeal of BHO's adverse benefits determination on July 19,

2016, arguing that BHO wrongfully denied benefits to them because BHO: (1) failed to make

specific references to the record on which BHO based its conclusion that Amanda's treatment was

not medically necessary; (2) failed to disclose the identity and relevant credentials of the claims

reviewer; (3) did not make any findings regarding the medical necessity of RTC care for Amanda

M's independent substance abuse condition; and (4) used overly stringent criteria for the type of

care Amanda received at New Haven. *See* REC 1512–15. Plaintiffs also provided a detailed

account of Amanda's behavioral and treatment history, pointing to specific support in Amanda's

medical records and attaching the relevant documents to their appeal. *See* REC 1515–21. On

August 4, 2016, BHO stated it reviewed Plaintiffs' appeal and maintained its initial denial,

reasoning that:

> You are a 17 year old female admitted to a mental health residential
> level of care on 12/21/2015, due to depression, oppositional and
> defiant behavior, truancy, and run away behavior, a history of lying,
> theft, drug use, alcohol use, & family conflict. Based on information
> reported, you were treated with therapy and medications. There is
> evidence that you were complaint [sic] with treatment, you had
> family support and involvement and your symptoms improved.
> Additionally, you did not have any thoughts of self-harm or harm to
> others. As of 01/19/2016, it was not medically necessary for your
> symptoms to be addressed in residential level of treatment. Your
> symptoms could have been safely treated in a less restrictive level
> of care such as in outpatient treatment with family therapy and
> medication management.

REC 0336.

Plaintiffs filed a level two appeal of BHO's denial of benefits on October 31, 2016. REC

1494. Plaintiffs stated that BHO's level one appeal decision failed to engage with their arguments

and the evidence in the medical record in denying RTC benefits. REC 1495. Plaintiffs reiterated

that BHO's denial of benefits violated ERISA because BHO had not addressed Amanda's

substance abuse condition, did not disclose the name and relevant credentials of BHO's medical

reviewers, failed to provide specific references to the record supporting the lack of medical

necessity, and had utilized improper criteria. *Id.* On December 1, 2016, BHO again upheld its

denial of benefits and stated:

> You are a 17 year old female admitted to the mental health
> residential treatment service level of care on 12/21/2015. On
> admission, you were withdrawn and not fully cooperative with the
> treatment programming. You were treated with individual, group,
> family, horse, and milieu therapies. You successfully ventured away
> from the facility several times without incident and had not engaged
> in any self-harming behaviors. You were not psychotic or aggressive
> and you have a supportive family. As of 01/19/2016 it was not
> medically necessary for your symptoms to be treated with
> residential treatment service monitoring and they could have been
> safely addressed in a less restrictive level of care such as in
> outpatient treatment with individual treatment, family work and
> medication management.

REC 0340. BHO's level two denial letter also informed Plaintiffs that they had exhausted all

administrative appeals and had the right to seek judicial review of BHO's decision. REC 0341.

In sum, BHO authorized services and covered benefits for Amanda's RTC care at New

Haven from December 21, 2015 through January 18, 2016, but denied benefits from January 19,

2016, to her discharge on October 21, 2016. BHO then upheld that adverse benefits determination

through two levels of internal appeals.

### E.  THE PARTIES' ARGUMENTS

Plaintiffs' claim arises under 29 U.S.C. § 1132(a), which provides that an ERISA plan

participant or beneficiary may sue "to recover benefits due to him under the terms of his plan, to

enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the

terms of the plan." Plaintiffs move for summary judgment and argue they are entitled to a reinstatement of benefits for Amanda's treatment at New Haven between January 19, 2016, and October 21, 2016. *See* ECF No. 27. Specifically, they assert that BHO wrongfully denied their claims by (1) failing to consider Amanda's substance use disorder; (2) applying improper medical necessity criteria that are inconsistent with the Plan, are internally contradictory, and fall below generally accepted standards of care; and (3) failing to give a reasoned explanation for the denial that is supported by substantial evidence. *Id.* Plaintiffs contend that the appropriate standard of review is *de novo* because of alleged serious procedural irregularities in BHO's adverse benefits determination process. Moreover, Plaintiffs seek an award of prejudgment interest and attorney's fees and costs.

Defendants also move for summary judgment, contending that BHO properly denied Plaintiffs benefits according to the Plan's requirement that requested RTC care services must be medically necessary for the claimant. ECF No. 24. Defendants argue that the arbitrary and capricious standard of review is appropriate because the Plan vests discretion in BHO to interpret the Plan and make benefits claims determinations, and there are insufficient procedural irregularities to deviate from this deferential standard. Defendants further contend that because it alleges BHO's denial of benefits was reasonable, Plaintiffs are not entitled to an award of prejudgment interest or attorney's fees and costs.

## II.   LEGAL STANDARD

### A.  SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When both parties move for summary judgment in an ERISA case, thereby "stipulat[ing] that no trial is necessary, 'summary

judgment is merely a vehicle for deciding the case; the factual determination of eligibility of benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor.'" *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (quoting *Bard v. Boston Shipping Ass'n*, 471 F.3d 229, 235 (1st Cir. 2006)).

## B.  STANDARD OF REVIEW FOR DENIAL OF BENEFITS

The court must first determine what standard of review is appropriate to evaluate BHO's denial of benefits for Amanda's treatment at New Haven. Defendants argue that the court must give significant deference to the determinations of BHO reviewers because BHO has discretionary authority to make coverage decisions under the Plan and complied with ERISA's procedural requirements. Accordingly, Defendants urge the court to apply an arbitrary and capricious review standard of review. On the other hand, Plaintiffs argue that the court should apply *de novo* review because they allege that BHO reviewers failed to follow ERISA's minimal procedural requirements, both in its initial adverse benefits determination and during the appeals process.[2] The court determines that serious procedural irregularities throughout BHO's claims denial process warrant a *de novo* standard of review in this case. However, the substantive defects in BHO's adverse benefits determination call for a reversal of BHO's denial of benefits and remand to the administrator even under an arbitrary and capricious standard of review.

---

[2] Plaintiffs alternatively argue that BHO's decision is entitled to lesser deference because it breached its fiduciary duty under ERISA by operating under an inherent conflict of interest. But the court agrees with Defendants that "Plaintiffs failed to assert any purported conflict of interest in their Complaint or opening brief and have provided no evidence to establish any such conflict exists." ECF No. 41 at 11. Therefore, the court does not consider this argument in determining the applicable standard of review in this case.

### 1.   Deferential Standard of Review

For an ERISA "action challenging an administrative denial of benefits" under 29 U.S.C. § 1132(a)(1)(B), the statute "does not specify the standard of review that courts should apply." *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1315 (10th Cir. 2009). But applying trust principles, the Supreme Court has determined that, in general, "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If the plan vests such discretion in the administrator, a reviewing court will apply "a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious." *Weber v. GE Grp. Life Assurance Co.*, 541 F.3d 1002, 1010 (10th Cir. 2008) (citations and internal quotation marks omitted). Here, there is no dispute that that the Plan expressly gives BHO, as the claims administrator, the discretion to develop criteria and determine whether a claimant is entitled to benefits under the Plan. *See* ECF Nos. 27 at 13, 37 at 19.

"Under arbitrary and capricious review, this court upholds [the administrator's] determination so long as it was made on a reasoned basis and supported by substantial evidence." *Van Steen v. Life Ins. Co. of N. Am.*, 878 F.3d 994, 997 (10th Cir. 2018). The court "need not determine that the [administrator's] interpretation was the only logical one, nor even the best one. Instead, the decision will be upheld unless it is not grounded an any reasonable basis." *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1193 (10th Cir. 2007) (citations and internal quotation marks omitted), *abrogated on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008).

But as the Tenth Circuit recently emphasized, "the arbitrary and capricious standard of review is not without meaning." *McMillan v. AT&T Umbrella Benefit Plan No. 1*, 746 F. App'x

697, 705 (10th Cir. 2018) (unpublished). The administrator's decision must be supported by substantial evidence, which "mean[s] more than a scintilla of evidence that a reasonable mind could accept as sufficient to support a conclusion." *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1134 (10th Cir. 2011) (citation and internal quotation marks omitted). The determination must be "based upon the record as a whole," and the court "must take into account whatever in the record fairly detracts from its weight." *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002) (citations, internal quotation marks, and alterations omitted). Additionally, the court's arbitrary and capricious review must account for the fact that "ERISA imposes 'a special standard of care upon a plan administrator.'" *McMillan*, 746 F. App'x at 705 (quoting *Glenn*, 554 U.S. at 115). Namely, the administrator, acting as a fiduciary, must "discharge [its] duties" with respect to discretionary claims decisions "solely in the interests of the participants and beneficiaries" of the plan under 29 U.S.C. § 1104(a)(1), *Glenn*, 554 U.S. at 115, and consistent with this standard of care, must "provide a 'full and fair review' of claim denials" under 29 U.S.C. § 1133(2), *Firestone Tire*, 489 U.S. at 113.

### 2. Lesser Deference for Serious Procedural Irregularities

A claims administrator is entitled to a less deferential standard of review if its initial denial of benefits or internal appeal review process failed to comply with ERISA's procedural requirements. *See Rasenack*, 585 F.3d at 1316–17. ERISA provides:

> In accordance with regulations of the [Department of Labor], every employee benefit plan shall--
>> **(1)** provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and
>> **(2)** afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

14

29 U.S.C. § 1133. Under this statutory authority, in 2002 the Department of Labor established the procedural regulations governing this case. These regulations "set[] forth minimum requirements for employee benefit plan procedures pertaining to claims for benefits by participants and beneficiaries." 29 C.F.R. § 2560.503-1(a).

At the initial adverse benefits determination stage, subsection (g) of the regulations requires administrators to make certain pieces of information available to claimants, including (1) "[t]he specific reason or reasons for the adverse determination;" (2) "[r]eference to the specific plan provisions on which the determination is based;" (3) "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;" (4) "[a] description of the plan's review procedures and the time limits applicable to such procedures;" and (5) for denials based on lack of medical necessity, "an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances." *See* § 2560.503-1(g)(1)(i)–(v).

Concerning ERISA's guarantee of a "full and fair review" of the claims administrator's adverse benefits determination, subsection (h) requires the administrator to offer claimants "a reasonable opportunity to appeal" through a process that must "take[] into account all comments, documents, records, and other information submitted by the claimant relating to the claim" and provide "reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits." § 2560.503-1(h)(2)–(3)(iii), (iv). Relevant information is anything "relied upon in making the benefit determination" or "submitted, considered, or generated in the course of making the benefit determination." § 2560.503-1(m)(8). Additionally, in deciding an appeal based on lack of medical necessity, the claims administrator

must "consult with a healthcare professional who has appropriate training and experience in the field of medicine involved in the medical judgment." § 2560.503-1(h)(3)(iii).

In sum, ERISA's procedural regulations establish that at the initial denial stage, "the administrator must provide the claimant with a comprehensible statement of reasons for the denial," and during the appeals process, must engage in a full and fair review that represents "a meaningful dialogue between ERISA plan administrators and their beneficiaries." *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 635 (10th Cir. 2003) (citation omitted). Such a "full and fair review requires knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of the evidence, and having the decision-maker consider the evidence presented [by the claimant] . . . prior to reaching and rendering his decision." *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992) (citation and internal quotation marks omitted). These requirements are calibrated to "further the overall purpose of [ERISA's] internal review process: to minimize the number of frivolous lawsuits; promote consistent treatment of claims; provide a nonadversarial dispute resolution process; and decrease the cost and time of claims settlement." *Spradley v. Owens-Illinois Hourly Employees Welfare Ben. Plan*, 686 F.3d 1135, 1140 (10th Cir. 2012) (citation and internal quotation marks omitted).

If an ERISA claims administrator fails to follow these minimal procedural requirements, "a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies" for an alleged wrongful denial of benefits in federal court. 29 C.F.R. § 2560.503-1(*l*). In the case of "serious procedural irregularities" that violate ERISA's regulations, the court applies "de novo review where deferential review would otherwise be required." *Martinez v. Plumbers & Pipefitters Nat'l Pension Plan*, 795 F.3d 1211, 1215 (10th Cir. 2015). As the Tenth Circuit has recognized, this rule is

"bolstered by the Department of Labor's indication, in revising § 2560.503–1(*l* ), that it intended 'to clarify that the procedural minimums of the regulation are essential to procedural fairness and that a decision made in the absence of the mandated procedural protections *should not be entitled to any judicial deference*.'" *LaAsmar*, 605 F.3d at 799 (quoting Pension and Welfare Benefits Administration, 65 Fed. Reg. 70246–01, 70255 (Nov. 21, 2000)). A claims administrator's "single honest mistake" does not warrant reducing the degree of deference, *Conkright v. Frommert*, 559 U.S. 506, 509 (2010), but vesting the administrator with deference in the face of numerous or severe procedural deficiencies would frustrate ERISA's core purpose of "promot[ing] the interests of employees and their beneficiaries in employee benefit plans," *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983).

### 3.  Applicable Standard of Review Here

Serious procedural irregularities in BHO's adverse benefits determination warrant *de novo* review in this case for two reasons. First, BHO reviewers entirely failed to consider whether RTC care was medically necessary to treat Amanda's substance use disorder, which is akin to failing to respond to an insured's claim for benefits or appeal of a denial of benefits within ERISA's deadlines. Second, BHO's review presents multiple other procedural irregularities, including declining to reveal the identity and relevant credentials of the reviewers who made the medical necessity determinations, failing to engage in a "meaningful dialogue" with Plaintiffs by not taking the information provided in their appeal into account, and falling short of providing specific reasons to explain the clinical judgment of its medical necessity determination. Such deficiencies are serious violations of ERISA's minimum procedural requirements. However, as described

below, shortfalls in the merits of BHO's adverse benefits determination warrant reversal and remand even under an arbitrary and capricious review standard.[3]

### (i)    Failure to Address Substance Use Disorder

First, the record demonstrates that BHO failed to consider Amanda's substance use disorder as an independent condition that render her treatment at New Haven medically necessary. The Tenth Circuit has repeatedly held that a claim administrator's denial of benefits is only entitled to a "deferential standard of review to the extent the administrator actually exercised a discretionary power vested in it by the terms of the Plan." *Spradley*, 686 F.3d at 1140 (citing *Rasenack*, 585 F.3d at 1315); *see also LaAsmar*, 605 F.3d at 798 (ruling that a "plan administrator is not entitled to the deference of arbitrary and capricious review when . . . the administrator made no decision to which a court may defer" (citation omitted)). When the administrator fails to render a decision on the claimant's demand for benefits, "the remedies [are] 'deemed exhausted' by operation of law rather than the exercise of administrative discretion, and *Firestone*'s rule of deference does not apply." *Rasenack*, 585 F.3d at 1316 (quoting 29 C.F.R. § 2560.503–1(*l* )).

The Tenth Circuit has reduced deference to the claims administrator when it fails to timely respond to a claimant's appeal of a denial of benefits. *See, e.g.*, *id.* at 1317–18 (170 days late);

---

[3] Because reversal and remand is warranted under arbitrary and capricious review, the court need not reach whether the *Gilbertson* "substantial compliance" doctrine applies to excuse some procedural irregularities in an administrator's process. *See* 328 F.3d at 635. Rather, the court discusses these procedural shortcomings in BHO's claims review process to instruct BHO on what it must do to comply with ERISA's minimum procedural requirements on remand. The court notes that the Tenth Circuit has explicitly left open whether the substantial compliance doctrine applies to the revised 2002 regulations, *see, e.g.*, *Rasenack*, 585 F.3d at 1316; *Kellogg v. Metropolitan Life Ins. Co*., 549 F.3d 818, 828 (10th Cir. 2008); *Finley v. Hewlett–Packard Co. Employee Benefits Org. Income Prot. Plan*, 379 F.3d 1168, 1175 n.6 (10th Cir. 2004), and at least one other circuit court and one district court in the Tenth Circuit have held that giving an administrator leeway for its substantial compliance with ERISA's procedures is incompatible with the new governing regulations, *see Halo v. Yale Health Plan*, 819 F.3d 42, 56–57 (2d Cir. 2016); *Reeves v. UNUM Life Ins. Co*., 376 F. Supp. 2d 1285, 1293 (W.D. Okla. 2005).

*LaAsmar*, 605 F.3d at 797–800 (110 days late); *Kellogg*, 549 F.3d at 827–28 (no decision); *Gilbertson*, 328 F.3d at 631, 637 (no decision). The reasoning underlying those decisions is that "[d]eference to the administrator's expertise is inapplicable where the administrator has failed to apply his expertise to a particular decision." *Gilbertson*, 328 F.3d at 632. That reasoning applies with equal force to determining the standard of review in this case. Where a claims administrator denies benefits for lack of medical necessity for one condition but fails to make a determination of medical necessity for a second, independent condition, the administrator has similarly "failed to apply his expertise to a particular decision." *See id.* Stated differently, *Firestone Tire* directs that, based on trust law principles, "a deferential standard of review [is] appropriate when a trustee *exercises* discretionary powers," 489 U.S. at 111 (emphasis added), and it stands to reason that if an administrator fails to exercise discretion by ignoring an independent basis for the claimant's demand for benefits, then a deferential standard of review is inappropriate.

Here, the record demonstrates that BHO's failure to consider Amanda's substance use disorder as an independent basis upon which Plaintiffs seek benefits is a serious procedural irregularity. The Plan offers benefits for medically necessary mental health and substance use treatment at an RTC. *See* REC 0019, 0021, 0025, 0027, 0031, 0033. It defines residential treatment as "24-hour residential care" that "provides structured mental health *or* substance abuse treatment" for "patients who don't require acute care services or 24-hour nursing care." REC 0087 (emphasis added). BHO uses one set of medical necessity criteria for RTC care. *See* REC 0398–99.

Ample record evidence indicates that Amanda had a substance use disorder and sought RTC treatment for this condition in addition to her mental health condition. First, BHO does not dispute Amanda's long history of difficulties with alcohol and narcotics abuse. *See* ECF No. 37 at 9–11. The record details Amanda's building substance dependency and risky behavior involving

drugs and alcohol, *see id.*, which led to a diagnosis of "alcohol use disorder" and "substance use disorder" from the treatment facility at which she received care in 2014, *see* REC 1518, 1556.

Second, the record reveals that Amanda's outpatient treating physicians recognized she had a substance use disorder in the months before her admission to New Haven. For example, Michael Guymon, a licensed clinical social worker for the State of Idaho, evaluated Amanda and her records on November 18, 2015, and concluded that she had engaged in substance abuse and her "impulsivity and disregard for rules may lead her further into substance use without appropriate intervention." REC 1581.

Third, it is beyond dispute that Amanda sought and received care for her substance use disorder at New Haven. One of Amanda's treating psychologists at New Haven, Dr. Brett Merrill, conducted three evaluations of Amanda and observed that "there is a **high** probability she has had a substance abuse disorder in the past six months." REC 3945 (emphasis in original). Dr. Merrill concluded that "residential treatment is warranted and recommended" for her condition, in part to monitor "[h]er perceptions and behaviors toward drugs." REC 3946. Additionally, Amanda's discharge notes from New Haven summarize that because "Amanda presented with a very low sense of self-worth and lack of insight around her identity and role in her family and social with peers" at her admission, she has "coped with her depressive and anxious feeling through acting out, self-harm, or substance use," including by "us[ing] alcohol as a way to numb out." REC 2649–50. Amanda had "indicated that her drug of choice is OxyContin," "she has also abused alcohol and a variety of pills," "she used alcohol as a way of escaping her problems," and "she admitted that she would continue to abuse drugs now, if she could." REC 3940–41. Accordingly, on January 16, 2016, just three days before BHO discontinued benefits, New Haven diagnosed Amanda with

"substance use and addictive disorders" and included addressing these conditions as part of its Master Treatment Plan. REC 3931.

Yet at each stage of BHO's adverse benefits determination process, BHO only considered the medical necessity of RTC treatment for Amanda's mental health diagnoses and ignored this record evidence of Amanda's independent substance use disorder. In BHO's initial denial letter dated January 25, 2016, the BHO reviewer stated that Amanda was "admitted to a mental health residential program" at New Haven. REC 0346. BHO then denied continued benefits, reasoning that Amanda "ha[d] no intent or plan for self-harm," was "not aggressive, oppositional, or defiant," and was "able to attend to [her] self-care needs." *Id*. Nowhere in this letter did the BHO reviewer mention Amanda's independent substance use disorder or provide analysis concerning the medical necessity of RTC care for that condition. BHO's failure to address Amanda's substance use disorder in its initial denial of benefits violates subsection (g) of ERISA's regulations because (1) BHO failed to provide the "specific reason or reasons for the adverse determination" for benefits related to substance abuse care, *see* 29 C.F.R. § 2560.503-1(g)(1)(i), and (2) BHO failed to provide "an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances" concerning the lack of medical necessity for RTC care for Amanda's substance use disorder, *see* § 2560.503-1(g)(1)(v)(B).

In their July 19, 2016 level one appeal, Plaintiffs emphasized record evidence that indicates New Haven treated Amanda for both mental health and substance abuse conditions, and requested that BHO reviewers determine the medical necessity of RTC care for both conditions. REC 1514. On August 4, 2016, BHO upheld its denial of benefits without doing so. The reviewer recognized that Amanda had a "history of . . . drug use [and] alcohol use," but none of BHO's reasoning in support of upholding its denial of benefits addresses these conditions. *See* REC 0336. In their

October 31, 2016 level two appeal, Plaintiffs reiterated that New Haven was treating Amanda for both mental health and substance abuse conditions and asked BHO to make a benefits determination for both treatments. *See* REC 1495. Again, the BHO reviewer did not consider the abundant record evidence of Amanda's substance use disorder. *See* REC 0340. In reviewing internal appeals, ERISA compels administrators to engage in a "meaningful dialogue" with claimants through a "full and fair review," *Gilbertson*, 328 F.3d at 635, but BHO's appeal letters show no indication that the BHO reviewers had "take[n] into account all comments, documents, records, and other information submitted by the claimant relating to the claim," 29 C.F.R. § 2560.503-1(h)(2)(iv). Thus, BHO's failure to consider Amanda's substance use disorder as a basis for RTC benefits—despite Plaintiffs' repeated requests and emphasis of evidence in the record—violates ERISA's procedural requirements for internal appeals under subsection (h).

In sum, the record demonstrates that at all stages of the administrative process, BHO failed to consider how Amanda's diagnosed substance use disorder may have made it medically necessary for her to receive RTC care at New Haven. BHO made this oversight in direct conflict with the Plan offering benefits for medically necessary RTC care for either "structured mental health *or* substance abuse treatment," REC 0087 (emphasis added), undisputed record evidence that Amanda had diagnoses and continued symptoms of a substance use disorder, *see, e.g.*, REC 1518, 1556, 1581, 2649–50, 3931, 3940–41, 3945–46, and Plaintiffs' repeated requests for BHO to consider Amanda's substance use disorder, *see* REC 1495, 1514. Because BHO did not render a decision concerning the medical necessity of RTC care for Amanda's substance use disorder, "[d]eference to the administrator's expertise is inapplicable." *See Gilbertson*, 328 F.3d at 632. Therefore, the court may apply a *de novo* standard of review for this reason alone.

### (ii) Additional Serious Procedural Irregularities

The cumulative effect of additional serious procedural irregularities also warrants *de novo* review. "[W]hen a plan administrator's actions fall so far outside the strictures of ERISA that it cannot be said that the administrator exercised the discretion that ERISA and the ERISA plan grant, no deference is warranted." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 972 (9th Cir. 2006) (en banc). Here, BHO committed numerous other procedural defaults that fall far outside the strictures of ERISA's procedural regulations.

First, section (h)(3) of ERISA's appeal procedure regulations requires that administrators that deny benefits for lack of medical necessity "consult with a healthcare professional who has appropriate training and experience in the field of medicine involved in the medical judgment" and "provide" the claimants with "the identification of medical . . . experts whose advice was obtained on behalf of the plan in connection with a claimant's adverse benefit determination." 29 C.F.R. § 2560.503-1(h)(3)(iii)–(iv). As the Ninth Circuit has recognized, "fail[ing] to identify the reviewing physician whose advice [the administrator] obtained in connection with" an appeal of a benefits denial constitutes a "serious procedural violation[]." *Lukas v. United Behavioral Health*, 504 F. App'x 628, 630 (9th Cir. 2013) (unpublished). Despite Plaintiffs' repeated requests during the administrative process, *see* REC 1513–14, 1495, BHO failed to disclose the identity of its medical necessity reviewers or their relevant expertise and credentials to evaluate RTC care for adolescents with mental health and substance use disorders, *see* REC 0336, 0340.[4]

---

[4] As this court recently held, the administrator's use of an unqualified medical professional to make a medical necessity determination may also amount to an arbitrary and capricious denial of benefits because doing so deprives the claimant of their right to a full and fair review. *See E.W. v. Health Net Life Ins. Co.*, No. 2:19-CV-499-TC, 2020 WL 2543353, at *5 (D. Utah May 19, 2020) (unpublished) (citing *Lafleur v. Louisiana Health Serv. & Indemn. Co.*, 563 F.3d 148, 155 (5th Cir. 2009) and *Okuno v. Reliance Std. Life Ins. Co.*, 836 F.3d 600, 610–11 (6th Cir. 2016)).

Second, subsection (h)(2)(iv) requires administrators to "provide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination." 29 C.F.R. § 2560.503-1(h)(2)(iv). "[I]f a plan administrator fails to gather or examine relevant evidence" in accordance with this requirement, the court is to "give less deference." *Caldwell*, 287 F.3d at 1282 (citing *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1097 (10th Cir. 1999)); *see also Kerry W. v. Anthem Blue Cross & Blue Shield*, No. 2:19-CV-67, 2020 WL 1083631, at *5 (D. Utah Mar. 6, 2020) (unpublished) (applying the rule from *Caldwell* and *Kimber* in the mental health/substance abuse benefits context). Here, based on the dearth of analysis in BHO's denial letters, the record shows no indication that BHO "provide[d] for a review that takes into account" the Plaintiffs' submitted information on appeal. *See* § 2560.503-1(h)(2)(iv). BHO's summary statement that "[t]his review included any additional information received in support of your appeal," REC 0336, 0340, falls far short of the "meaningful dialogue" that ERISA envisions and that warrants deference to the administrator in the first place, *see Gilbertson*, 394 F.3d at 365.

Third, subsection (g) requires claims administrators that deny benefits based on the lack of medical necessity to provide claimants the "specific reason or reasons for the adverse determination," 29 C.F.R. § 2560.503-1(g)(1)(i), and "an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances," § 2560.503-1(g)(1)(v)(B). Throughout the adverse benefits determination process, Plaintiffs twice requested that BHO provide them with the references to the medical records on which it based its conclusory determination regarding lack of medical necessity, *see* REC 1495, 1513, and BHO twice failed to do so, *see* REC 0336, 0340. Such a failure is not "a single honest

24

mistake," *cf. Conkright*, 559 U.S. at 509, but a repeated violation of ERISA's minimum procedures that require administrators to explain "the specific reason for denying benefits" rather than giving "[b]ald-faced conclusions," *Flinders*, 491 F.3d at 1192 (quoting *Richardson v. Cent. States, Se. & Sw. Areas Pension Fund*, 645 F.2d 660, 665 (8th Cir. 1981)).

In sum, serious procedural irregularities in BHO's adverse benefits determination warrant *de novo* review in this case because BHO failed to make a medical necessity determination about Amanda's substance abuse, did not disclose the relevant credentials of its medical necessity reviewers, failed to engage in a "meaningful dialogue" with Plaintiffs on appeal, and did not provide specific reasons to explain the clinical judgment of its medical necessity determination. BHO must address these procedural shortfalls on remand, but the court need not apply *de novo* review because BHO's adverse benefits determination fails even an arbitrary and capricious standard of review.

### III.     ANALYSIS

Plaintiffs contend that BHO's denial of benefits was arbitrary and capricious because BHO failed to consider Amanda's substance abuse condition, applied improper medical necessity criteria, and failed to provide a reasoned explanation that was supported by substantial evidence in the record. Accordingly, Plaintiffs seek a retroactive reinstatement of benefits for the approximately nine months of Amanda's care at New Haven that BHO did not authorize, as well as prejudgment interest and an award of attorney's fees and costs. Defendants contend that they are entitled to summary judgment because BHO's denial of benefits was not arbitrary and capricious and its decision was reasonable and supported by substantial evidence.

The court holds that Plaintiffs are entitled to summary judgment because BHO's denial of benefits was arbitrary and capricious. Specifically, BHO's denial was arbitrary and capricious because BHO: (1) failed to address the medical necessity of Amanda's substance abuse treatment;

(2) applied acute-level medical necessity criteria to evaluate whether Amanda's diagnoses, conditions, and symptoms warranted RTC care, which is inconsistent with the Plan's definition of RTC care as subacute; (3) did not offer a reasoned analysis that applies appropriate medical necessity criteria to Amanda's circumstances; and (4) failed to consider ample medical evidence in Amanda's record that is contrary to BHO's lack of medical necessity determination, including the opinions of Amanda's treating physicians. Accordingly, the court remands this case to BHO to reconsider Plaintiffs' claim for benefits consistent with this decision. Moreover, the court denies Plaintiffs' request for prejudgment interest, but grants their request for attorney's fees and costs.

## A. ARBITRARY AND CAPRICIOUS DENIAL OF PLAN BENEFITS

Plaintiffs seek to recover benefits allegedly due under the Plan for Amanda's treatment at New Haven between January 19, 2016, and October 21, 2016. "When reviewing a plan administrator's decision to deny benefits," the court must "consider only the rationale asserted by the plan administrator in the administrative record and determine whether the decision, based on the asserted rationale, was arbitrary and capricious." *Weber*, 541 F.3d at 1011 (citation and quotations omitted). The court "make[s] that determination based on the language of the plan," *id.*, and by examining the "the record as a whole," *Caldwell*, 287 F.3d at 1282. The court will "uphold[] [the administrator's] determination so long as it was made on a reasoned basis and supported by substantial evidence." *Van Steen*, 878 F.3d at 997 (citation omitted). "Indicia of arbitrary and capricious decisions include lack of substantial evidence, mistake of law, bad faith, and conflict of interest by the fiduciary." *Caldwell*, 287 F.3d at 1282 (citation omitted). The court also "consider[s] whether: (1) the decision was the result of a 'reasoned and principled process,' (2) is 'consistent with any prior interpretations by the plan administrator,' (3) is 'reasonable in light of

any external standards,' and (4) is 'consistent with the purposes of the plan.'" *Flinders*, 491 F.3d at 1193 (quoting *Fought v. UNUM Life Ins. Co. Of Am.*, 379 F.3d 997, 1003 (10th Cir. 2004)).

The court holds that BHO's denial of benefits to Plaintiffs was arbitrary and capricious because BHO (1) failed to make a medical necessity determination about Amanda's substance abuse condition, (2) applied acute-level criteria that is inconsistent with the Plan defining RTC care as a treatment for subacute conditions, (3) offered conclusory statements rather than a reasoned analysis applying appropriate medical necessity criteria to Amanda's circumstances, and (4) was unreasonable because BHO lacked substantial evidence supporting its decisions and ignored ample contrary record evidence and the opinions of Amanda's treating physicians.

### 1. Failure to Address Substance Use Disorder

First, BHO's denial of benefits for Amanda's care at New Haven was arbitrary and capricious because BHO failed to consider Amanda's substance use disorder, which may necessitate RTC treatment independent of her mental health condition. The court considers whether BHO's "decision was the result of a 'reasoned and principled process,'" and "is 'consistent with the purposes of the plan.'" *Flinders*, 491 F.3d at 1193 (quoting *Fought*, 379 F.3d at 1003). Under this review, an administrator wrongfully denies benefits when it fails to address "another independent ground for [benefits] presented in the record and specifically raised in [the claimant's] administrative appeal." *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 806 (10th Cir. 2004). Moreover, "if the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it." *Gilbertson*, 328 F.3d at 635 (quoting *Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997)).

In *Gaither*, the Tenth Circuit held that an administrator's denial of benefits was arbitrary and capricious when the claims reviewer made findings concerning one of the claimant's conditions but failed to do so for an additional condition. *See* 394 F.3d at 805–06. The court ruled

27

that while the claims administrator "had substantial evidence supporting their conclusion that [the claimant] was not psychologically disabled, they did not have substantial evidence about the extent or effects of his uncontroverted use of painkillers," a separate ground for benefits. *Id*. at 806. As a result, the administrator "rejected the claim [for benefits] without a substantial basis for doing so, without following up on obvious leads, and apparently without specifically considering the claim at all." *Id.* The court ruled that such an omission was arbitrary and capricious and further explained that administrators "cannot shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement [to benefits] and when they have little or no evidence in the record to refute that theory." *Id.* at 807.

For the same reasons as in *Gaither*, BHO's denial of benefits was arbitrary and capricious because it failed to consider Amanda's substance use disorder. As detailed above in discussing the serious procedural irregularities in BHO's review process, the Plan offers benefits for "mental health *or* substance abuse treatment." REC 0087 (emphasis added); *see also* REC 0019, 0021, 0025, 0027, 0031, 0033 (showing Plan coverage of both types of conditions separately). Undisputed evidence in the record reveals that Amanda had a history of substance abuse and prior diagnoses documenting this condition, sought care at New Haven to treat her substance abuse, was evaluated at New Haven and again diagnosed with substance use disorders, and received treatment at New Haven to address her continued symptoms. *See, e.g.*, REC 1518, 1556, 1581, 2649–50, 3931, 3940–41, 3945–46. When BHO's initial adverse benefits determination failed to address Amanda's substance abuse treatment, Plaintiffs twice requested that BHO consider this condition and pointed to record evidence supporting their claim for benefits. REC 1495, 1514. BHO continued its error through two levels of appeals and never addressed the medical necessity of RTC care for Amanda's independent substance use disorder. REC 0336, 0340.

Like in *Gaither*, BHO rejected Plaintiffs' claim for benefits concerning Amanda's substance abuse "without a substantial basis for doing so, without following up on obvious leads, and apparently without specifically considering the claim at all." *See* 394 F.3d at 806. In doing so, BHO's decision was neither "consistent with the purposes of the plan" nor "the result of a reasoned and principled process." *See Flinders*, 491 F.3d at 1193 (quotations omitted). Thus, BHO acted in an arbitrary and capricious manner when it denied coverage without considering an independent ground for benefits, and reversal and remand to the administrator is warranted on this basis alone.

### 2.  Failure to Apply Criteria Consistent with the Plan

BHO also acted arbitrarily and capriciously in denying benefits to Plaintiffs by applying acute-level medical necessity criteria to RTC treatment that the Plan classifies as providing subacute care. To evaluate whether BHO's decision was arbitrary and capricious, the court must determine whether its decision was "consistent with the purposes of the plan," *Flinders*, 491 F.3d at 1193 (quoting *Fought*, 379 F.3d at 1003), and the court "make[s] that determination based on the language of the plan," *Weber*, 541 F.3d at 1011. In other words, a claims administrator's denial of benefits is arbitrary and capricious if it applies criteria that are based on "interpretations [that] are inconsistent with the plain language of the [Plan]." *Owings v. United of Omaha Life Ins. Co.*, 873 F.3d 1206, 1213 (10th Cir. 2017); *see also Caldwell*, 287 F.3d at 1283–84 (reversing denial of benefits where insurer applied more stringent criteria than the plan provides); *Spradley*, 686 F.3d at 1141–42 (same). Here, BHO's application of medical necessity criteria that calls for acute-level symptoms when the Plan recognizes that RTC treatment is for subacute conditions is arbitrary and capricious.

First, the court must interpret the Plan to "scrutinize the plan documents as a whole and, if unambiguous, construe them as a matter of law." *Weber*, 541 F.3d at 1011 (citations and internal quotation marks omitted). An "[a]mbiguity exists when a plan provision is reasonably susceptible

to more than one meaning, or where there is uncertainty as to the meaning of the term." *Rasenack*, 585 F.3d at 1318 (citation omitted). The court must construe the Plan from the perspective of what "the common and ordinary meaning as a reasonable person in the position of the plan participant . . . would have understood the words to mean." *Weber*, 541 F.3d at 1011 (citation omitted). Here, the Plan's provisions concerning RTC benefits are susceptible to only one meaning from the perspective of a reasonable person in the position of the plan participant: the Plan classifies RTC treatment as subacute, so the administrator must apply subacute medical necessity criteria to benefits decisions for claimants seeking RTC care for subacute mental health and/or substance abuse conditions.

The Plan offers benefits for medically necessary mental health and/or substance abuse care at an RTC, *see, e.g.*, REC 0019, 0021, 0025, 0027, 0031, 0033, and classifies residential treatment as a subacute level of care, *see* REC 0087. Specifically, it defines residential treatment as "24-hour residential care" that "provides structured mental health or substance abuse treatment" for "patients *who don't require acute care services* or 24-hour nursing care." *Id.* (emphasis added).[5] This definition is in contrast to what the Plan recognizes is the higher level of care for mental

---

[5] The Plan's classification of RTC care as subacute is grounded in federal agency policy and generally accepted standards of care. In ERISA claims involving the Parity Act, this court has observed that the federal agencies in charge of regulating insurance benefits have "indicate[d] that residential treatment centers provide an intermediate, subacute level of care for mental health/substance abuse conditions." *Johnathan Z. v. Oxford Health Plans*, No. 2:18-CV-383-JNP-PMW, 2020 WL 607896, at *18 (D. Utah Feb. 7, 2020) (unpublished) (citing Final Rules Under the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008; Technical Amendment to External Review for Multi–State Plan Program, 78 Fed. Reg. 68262 (Nov. 13, 2013)). And in a sweeping class action lawsuit pending in the Northern District of California, the court has surveyed evidence of generally accepted standards of care to distinguish residential treatment from partial hospitalization because hospitalization offers "an acute, crisis-focused level of care" for mental health and substance abuse conditions. *Wit v. United Behavioral Health*, No. 14-CV-02346-JCS, 2019 WL 1033730, at *17 (N.D. Cal. Mar. 5, 2019) (unpublished).

health and substance abuse conditions: "acute inpatient treatment." *See* REC 0019, 0021, 0025, 0027, 0031, 0033. In general, the Plan excludes coverage for "services that aren't considered medically necessary." REC 0036, 0150. The Plan defines medically necessary services as those:

- Intended to prevent, diagnose, correct, cure, alleviate or preclude deterioration of a diagnosable condition (ICD-9 or DSM-IV) that threatens life, causes pain or suffering or results from illness or infirmity.
- Expected to improve an individual's condition or level of functioning.
- Individualized, specific and consistent with symptoms and diagnosis and not in excess of patient's needs.
- Essential and consistent with nationally accepted standard clinical evidence generally recognized by mental health or substance abuse care professionals or publications.
- Reflective of a level of service that is safe, where no equally effective, more conservative and less costly treatment is available.
- Not primarily intended for the convenience of the recipient, caretaker or provider.
- No more intensive or restrictive than necessary to balance safety, effectiveness and efficiency.
- Not a substitute for non-treatment services addressing environmental factors.

REC 0086, 0213.

The court finds that these terms are unambiguous and, relevant to this analysis, establish that (1) RTC care is for patients whose condition requires "structured mental health or substance abuse treatment" but who "don't require acute care services or 24-hour nursing care;" (2) the services must be medically necessary based on the claimant's diagnoses, symptoms, and conditions; and (3) care is medically necessary if it is no more or less intensive than necessary, is consistent with generally accepted standards of care, and is expected to improve the claimant's diagnoses, symptoms, and conditions. Thus, the Plan terms provide that claimants are entitled to benefits for medically necessary mental health and/or substance abuse care at a subacute RTC to treat subacute symptoms, conditions, or diagnoses.

Second, the court must determine whether BHO's medically necessary criteria are consistent with the plain language and purposes of the Plan. *See Flinders*, 491 F.3d at 1193.

"[W]hen reviewing a plan administrator's decision to deny benefits, we consider only the rationale asserted by the plan administrator in the administrative record and determine whether the decision, based on the asserted rationale, was arbitrary and capricious." *Id.* at 1190.[6] BHO applied two sets of medical necessity criteria to deny continued benefits for Amanda's treatment at New Haven. BHO applied its continued care criteria for RTC treatment, which requires that claimants meet all of the following conditions:

> (1) Member continues to meet admission criteria;
> (2) Another less restrictive level of care would not be adequate to provide needed containment and administer care
> (3) Member is experiencing symptoms of such intensity that if discharged, would likely be readmitted;
> (4) Treatment is still necessary to reduce symptoms and improve functioning so member may be treated in a less restrictive level of care.
> (5) There is evidence of progress towards resolution of the symptoms causing a barrier to treatment continuing in a less restrictive level of care;
> (6) Medication assessment has been completed when appropriate and medication trials have been initiated or ruled out.
> (7) Member's progress is monitored regularly and the treatment plan modified, if the member is not making progress toward a set of clearly defined and measurable goals.
> (8) Family/guardian/caregiver is participating in treatment as clinically indicated and appropriate or engagement is underway.
> (9) There must be evidence of coordination of care and active discharge planning to: (a) transition the member to a less intensive level of care; (b) operationalize how treatment gains will be transferred to subsequent level of care.

---

[6] BHO also appears to raise arguments that it denied Plaintiffs benefits based on the Plan's exclusion of treatment for "personal growth and development." *See* ECF No. 37 at 31 (citing REC 0036–37, 0150–51). The court does not consider this argument because the BHO claims reviewers did not refer to this exclusion as a reason to deny benefits. *See Spradley*, 686 F.3d at 1140 (holding that an administrator may not "sandbag[]" plaintiffs in litigation and justify an arbitrary and capricious deviation from the plan terms by using "after-the-fact plan interpretations devised for purposes of litigation" (quoting *Flinders*, 491 F.3d at 1191)).

REC 0398–99. Because BHO's continued care criteria require claimants to also satisfy BHO's

admissions criteria throughout their treatment, claimants must also meet all of the following:[7]

> (1) DSM or corresponding ICD diagnosis and must have mood, thought, or behavior disorder of such severity that there would be a danger to self or others if treated at a less restrictive level of care.
> (2) Member has sufficient cognitive capacity to respond to active acute and time limited psychological treatment and intervention.
> (3) Severe deficit in ability to perform self-care activity is present (i.e. self-neglect with inability to provide for self at lower level of care).
> (4) Member has only poor to fair community supports sufficient to maintain him/her within the community with treatment at a lower level of care.
> (5) Member requires a time limited period for stabilization and community re-integration.
> (6) When appropriate, family/guardian/caregiver agree to participate actively in treatment as a condition of admission.
> (7) Member's behavior or symptoms, as evidenced by the initial assessment and treatment plan, are likely to respond to or are responding to active treatment.
> (8) Severe comorbid substance use disorder is present that must be controlled (e.g., abstinence necessary) to achieve stabilization of primary psychiatric disorder.

*Id*. Plaintiffs emphasize certain criteria that call for acute-level symptoms. *See* ECF No. 27 at 20,

25. For example, admissions criterion one requires that claimants have a "disorder of such severity

that there would be a danger to self or others." REC 0398. Admissions criterion two states that the

claimant must have "sufficient cognitive capacity to respond to *active acute* . . . psychological

treatment." *Id.* (emphasis added). And admissions criterion three authorizes care only if the

---

[7] Plaintiffs also contend that BHO's decision was arbitrary and capricious because it required them to satisfy both the continued care criteria and the admissions criteria during the duration of Amanda's treatment, which as a result required them to prove contradictory symptoms. ECF No. 27 at 22–24. For example, continued care criterion five requires "evidence of progress towards resolution of the symptoms," which is in tension with continued care criterion three that requires "symptoms of such intensity that if discharged, [the claimant] would likely be readmitted" and admissions criteria one, two, and three, which together require severe symptoms and the need for the claimant to receive "active acute . . . psychological treatment and intervention." REC 0398–99. Plaintiffs argue that by proving improvement, a claimant may be disproving the severe symptoms that BHO requires. The court need not reach this issue because it finds that BHO's acute-level criteria are themselves inconsistent with the Plan, but BHO is advised to address this tension on remand.

claimant has a "[s]evere deficit in ability to perform self-care activity." *Id.* As BHO's criteria set makes explicit, claimants must satisfy all of these requirements during the duration of their RTC treatment. *See id.* These criteria appear to require acute-level symptoms to warrant continued benefits for care that the Plan unambiguously defines as subacute.

Third, the court must determine whether BHO's application of its criteria to deny benefits in this case required claimants to prove acute-level conditions or symptoms. In all of BHO's denial of benefits letters, the reviewers state that they applied the above criteria sets to reach their conclusion that RTC treatment for Amanda's mental health conditions was not medically necessary. REC 0346, 0336, 0340.[8] Following these criteria, each letter includes conclusory explanations that appear to require acute-level symptoms for RTC benefits, in conflict with the Plan. For example, in BHO's initial January 25, 2016 adverse benefits determination, the reviewer stated that RTC care was not medically necessary in part because it determined that Amanda "ha[d] no intent or plan for self-harm." REC 0346. In upholding that decision in BHO's level one appeal letter dated August 4, 2016, the reviewer reached a similar conclusion, stating that RTC care was not medically necessary in part because Amanda "did not have any thoughts of self-harm or harm to others." REC 0336. In BHO's level two appeal letter dated December 1, 2016, the reviewer upheld the denial of benefits by again applying what appears to be acute-level criteria, including its conclusion that Amanda "had not engaged in any self-harming behaviors" and "w[as] not psychotic or aggressive." REC 0340. In applying these stringent criteria, BHO appears to have

---

[8] As described above, BHO reviewers did not make a medical necessity determination concerning RTC treatment for Amanda's separate substance use disorder. Therefore, the court only examines whether BHO's application of its criteria to reach a medical necessity determination for Amanda's mental health conditions was arbitrary and capricious.

required Plaintiffs to prove that Amanda was experiencing acute-level symptoms, in conflict with the Plan definition of RTC care as subacute.

This court confronted a similar incongruence between the Plan terms and the administrator's applied criteria in *James F. ex rel. C.F. v. CIGNA Behavioral Health, Inc.*, No. 1:09-CV-70 DAK, 2010 WL 5395075 (D. Utah Dec. 23, 2010) (unpublished). In *James F.*, the court determined that the claims administrator acted arbitrarily and capriciously in denying benefits because it "appeared to have denied [the claimant's] residential treatment by applying criteria more appropriately applied to acute inpatient admissions and treatment." *Id.* at *6. The difference in that case is that the claims administrator's medical necessity criteria for RTC care on their face complied with the plan at issue, but the claims reviewers had incorrectly applied that criteria to compel proof of acute-level symptoms. *See id.* For example, the court found that the administrator's criteria required that the "patient must have a diagnosed psychiatric disorder and have tried and failed at lower levels of treatment," but the reviewer applied the criteria to deny benefits because it determined that the claimant was not "a risk of harm to self or others" and did not show "psychosis, mania or severe depressive symptoms." *Id.* The court concluded that "the bases relied on by [the claims administrator] to deny [the claimant's] claim did not correlate to the residential treatment level of care guidelines" and held that "[t]here is no question that an ERISA plan fiduciary's failure to utilize the proper plan language or criteria in evaluating whether a plan beneficiary is entitled to benefits" is arbitrary and capricious. *Id.*; *see also Alice F. v. Health Care Serv. Corp.*, 367 F. Supp. 3d 817, 834 (N.D. Ill. 2019) (reversing denial of benefits where "many of the reasons Defendant gave for eventually finding Plaintiff's treatment not medically necessary are essentially unrelated to Plaintiff's treatment needs").

The reasoning from *James F.* counsels in favor of the same result here. The plain language of the Plan establishes that a claimant is eligible for RTC benefits if: (1) she is a patient that requires "structured mental health or substance abuse treatment" but "do[es not] require acute care services or 24-hour nursing care;" (2) the services sought are medically necessary based on the claimant's circumstances; and (3) the care is medically necessary if it is no more or less intensive than necessary, consistent with generally accepted standards of care, and expected to improve the claimant's diagnoses, symptoms, and conditions. *See* REC 0086–87. Nothing in the plain language of the Plan requires acute-level symptoms for RTC care. But BHO's medical necessity criteria purporting to interpret these provisions require acute-level symptoms, such as a "disorder of such severity that there would be a danger to self or others," a "severe deficit in ability to perform self-care activity," and claimants must have "sufficient cognitive capacity to respond to *active acute . . . psychological treatment.*" REC 0398 (emphasis added). And BHO applied that criteria to deny Plaintiffs benefits because it determined that Amanda lacked the requisite acute-level symptoms and conditions. *See* REC 0336, 0340, 0346.

In sum, BHO "has discretion in interpreting and administering the Plan, but this discretion does not stretch so far as to ignore the language of the Plan itself." *See Van Steen*, 878 F.3d at 1000. As in *James F.*, it appears BHO is "applying criteria more appropriately applied to acute inpatient admissions and treatment," which results in a "failure to utilize the proper plan language or criteria in evaluating whether a plan beneficiary is entitled to benefits." *See* 2010 WL 5395075, at *6. Because BHO's denial of benefits relied on criteria that are based on "interpretations [that]

are inconsistent with the plain language of the [Plan]," it acted in an arbitrary and capricious

manner. *See Owings*, 873 F.3d at 1213.[9]

### 3.  Reasonableness of the Denial of Benefits

Finally, the court must determine whether BHO's denial of benefits was overall reasonable

and supported by substantial evidence. "Under arbitrary and capricious review, this court upholds

[the administrator's] determination so long as it was made on a reasoned basis and supported by

substantial evidence." *Van Steen*, 878 F.3d at 997. The Tenth Circuit defines substantial evidence

as enough "evidence that a reasonable mind might accept as adequate to support the conclusion

reached by the decision maker," which must be "more than a scintilla but less than a

---

[9] Moreover, the court finds that BHO has pointed to nothing in the record to explain why Amanda met its medical necessity criteria when BHO authorized coverage three times in her first month of treatment, but then failed to meet the criteria starting January 19, 2016, when BHO discontinued benefits. BHO's internal notes show that the reviewer who recommended denying continued benefits made only conclusory statements that drew on no identifiable support in Amanda's medical records. *See* REC 0221–22. Indeed, BHO's conclusion that Amanda's condition improved is at odds with BHO's internal notes during this time. On December 30, 2015, BHO's internal notes indicate that it had information suggesting that Amanda was "stable, but depressed," had thoughts "over past 2 weeks" that she "would be better off dead," had recent "thoughts of hurting [her]self," and overall had "lots to work on." REC 0224. BHO's January 4, 2016 internal note recognizes that Amanda's condition was "not much different," that she is being treated for borderline personality disorder, and that she "will have to be [in RTC care for] a while" to improve her condition. *Id.* BHO's January 11, 2016 note indicates that New Haven shared that Amanda was "quite withdrawn," had "no progression in levels" of her condition, "remains odd and borderline personality [disorder]," and that her "[estimated length of stay] remains a year total." REC 0223. Finally, BHO's January 19, 2016 note (the day BHO terminated benefits), recognizes that it knew Amanda had "[n]o change in [estimated length of stay]" at New Haven, "[n]o change in [diagnosis]," "[n]o change in [discharge] readiness," and was yet to be approved for a "level change" based on improved symptoms. REC 0222. Amanda's unchanged condition led New Haven therapists to diagnose her with "Depressive Disorders," "Substance Use and Addictive Disorders," "Disruptive, Impulse Control and Conduct Disorders," "Personality Disorders," and "Trauma and Stressor Related Disorders," and set its Master Treatment Plan on January 16, 2016. REC 3931. However, BHO denied coverage starting just three days later on January 19, 2016, stating that Amanda could "appropriately be treated at the outpatient mental health level of care" because her "presenting symptoms have significantly resolved." REC 0346. Therefore, BHO seemingly ignored the information contained in its own internal notes, and its decision to deny benefits starting January 19, 2016, appears to be the product of an arbitrary choice rather than a reasoned application of the Plan to Amanda's condition.

preponderance." *Rekstad v. U.S. Bancorp*, 451 F.3d 1114, 1119–20 (10th Cir. 2006) (citations and quotations omitted). Substantial evidence supporting the claims administrator's decision demonstrates it "was the result of a 'reasoned and principled process,'" rather than an arbitrary choice. *Flinders*, 491 F.3d at 1193 (quoting *Fought*, 379 F.3d at 1003).

"Although the insured ultimately carries the burden of showing he is entitled to benefits, the plan administrator has a fiduciary duty to the insured to conduct an investigation and to seek out the information necessary for a fair and accurate assessment of the claim." *Rasenack*, 585 F.3d at 1324 (citing *Gaither*, 394 F.3d at 807–08). "[S]ubstantiality of the evidence is based upon the record as a whole," and the court "must take into account whatever in the record fairly detracts from [the] weight" of the administrator's decision. *Caldwell*, 287 F.3d at 1282 (citations, internal quotation marks, and alterations omitted). Claims administrators cannot "cherry-pick[] the information" contained in the administrative record "helpful to its decision to deny" benefits, *Rasenack*, 585 F.3d at 1326, and "shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement [to benefits] and when [the claims administrators] have little or no evidence in the record to refute that theory," *Gaither*, 394 F.3d at 807; *see also Caldwell*, 287 F.3d at 1284 (finding denial of benefits was arbitrary and capricious where the claims "administrator . . . ignored evidence that was relevant to her decision"). In sum, the court must look at the "overall picture that emerges from the record," *Rasenack*, 585 F.3d at 1324, and by "consider[ing] only the rationale asserted by the plan administrator in the administrative record," must "determine whether the decision, based on the asserted rationale, was arbitrary and capricious," *Spradley* 686 F.3d at 1140 (quoting *Flinders*, 491 F.3d at 1190).

Plaintiffs contend that BHO's decision was arbitrary and capricious because it failed to give a reasoned explanation for its denial of benefits and "ignored ample evidence in the Record showing that Amanda was in need of residential treatment." ECF No. 38 at 21. The court agrees because (1) BHO's denial letters contain merely conclusory statements, devoid of any reasoned application of the Plan terms or BHO's criteria to the facts of Amanda's condition; and (2) the BHO denial letters cherry-pick information in the record and ignore substantial evidence that fairly detracts from the weight of its decision. Therefore, BHO's adverse benefits determination was arbitrary and capricious because the BHO reviewers failed to identify substantial evidence supporting a denial of benefits and BHO's decision was unreasonable in light of the contrary evidence in the record.

### (i)       Failure to Provide a Reasoned Analysis

First, BHO's adverse benefits determination letters contain mere conclusory statements that fail to provide a reasoned explanation for BHO's denial and identify substantial evidence in the record supporting the decision. As the Tenth Circuit recently explained, the court's analysis must take heed that "ERISA imposes a special standard of care upon a plan administrator," which requires an administrator to "discharge its duties . . . solely in the interests of the participants and beneficiaries of the plan," and "provide a full and fair review of claim denials." *McMillan*, 746 F. App'x at 705 (quoting *Glenn*, 554 U.S. at 115 and *Firestone Tire*, 489 U.S. at 113) (internal quotation marks omitted). ERISA instructs claims administrators to offer the "specific reason" for a denial of benefits that "appl[ies] the terms of the plan to the claimant's medical circumstances." 29 C.F.R. § 2560.503-1(g)(1)(i), (v). Communicating a denial of benefits that "contain[s] nothing more than conclusory statements . . . without any discussion whatsoever" is "cause[] . . . to question that the Plan afforded [the claimant] the 'fair review'" required under ERISA. *McMillan*, 746 F.

App'x at 706.[10] If the claims administrator's denial letters display a "lack of *any* analysis, let alone a reasoned analysis," then it acted arbitrarily and capriciously. *Id.*

This court recently confronted the problem of an administrator's claims denial letters providing insufficient analysis and explanation in *Kerry W. v. Anthem Blue Cross & Blue Shield*, No. 2:19-CV-67, 2020 WL 1083631 (D. Utah Mar. 6, 2020) (unpublished). Like here, the *Kerry W.* plaintiffs sought RTC care for the claimant's mental health and substance use disorders, but the claims administrator denied coverage for lack of medical necessity. *See id.* at *3. The court held that the administrator's denial of benefits was arbitrary and capricious because it failed to adequately explain the reasons for its denial. *Id.* at *5. The denial letters offered only "conclusory statements such as '[y]ou could have been treated with outpatient services,' or 'you no longer need 24 hour structured care'" and "you are no longer harming yourself [and] you are able to control your behavior." *Id.* (alterations in original). Thus, the court ruled that the administrator's denial of benefits was arbitrary and capricious because the denial letters "contained no factual findings to support their conclusions about [the claimant's] mental health," "did not offer any responses to the diagnoses and reports included by [the claimant] in her appeal," and "did not cite any reports by [the administrator's] doctors or by doctors at [the RTC] on which they relied in reaching their

---

[10] This rule is widely supported in other circuit courts. *See, e.g.*, *Lukas*, 504 F. App'x at 629 (the Ninth Circuit ruling that a "conclusory statement did not constitute the 'meaningful dialogue' required by ERISA"); *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 852 (3d Cir. 2011) (holding that because the "language of the termination letter is conclusory and does not provide the 'specific reasons' as to why [the claimant] was no longer eligible for benefits," it fell "short of the requirements under § 503"); *Love v. Nat'l City Corp. Welfare Benefits Plan*, 574 F.3d 392, 397 (7th Cir. 2009) (holding that the claims administrator "must provide a reasonable explanation for its determination and must address any reliable, contrary evidence presented by the claimant" and "[b]are conclusions are not a rationale" (citations omitted)); *VanderKlok v. Provident Life & Acc. Ins. Co.*, 956 F.2d 610, 616 (6th Cir. 1992) (finding a denial letter "defective because it fails to provide the specific reason or reasons for denial and the specific reference to pertinent plan provisions on which the denial is based").

conclusions." *Id.* The court recognized that even "[i]f the reviewers' conclusions were based on 'substantial evidence,' no such evidence is cited in the explanations they sent to Plaintiffs." *Id.*

Like the denials in *Kerry W.*, BHO's denial of benefits was arbitrary and capricious. BHO's denial letters contain neither citations to the medical record nor references to the reports by BHO doctors or doctors at New Haven concerning the state of Amanda's condition. Instead, BHO's denial letters contain conclusory statements without factual support. For example, BHO's initial denial letter states that Amanda "can appropriately be treated at the outpatient mental health level of care" because her "presenting symptoms have significantly resolved." REC 0346. BHO's level one appeal decision repeated this conclusion, stating in part that Amanda's "symptoms could have been safely treated in a less restrictive level of care such as in outpatient treatment with family therapy and medication management" because her "symptoms improved." REC 0336. BHO's level two appeal decision is similarly conclusory, announcing—without factual findings—that Amanda was "not psychotic or aggressive" and had "a supportive family," so her condition "could have been safely addressed in a less restrictive level of care such as in outpatient treatment with individual treatment, family work and medication management." REC 0340.

Similar to the reviewers in *Kerry W.*, BHO did not explain the "factual findings to support their conclusions," "did not offer any responses to the diagnoses and reports included by [the claimant] in her appeal," and "did not cite any reports by [BHO's] doctors or by doctors at [New Haven] on which they relied in reaching their conclusions." *See* 2020 WL 1083631, at *5. This omission leads the court to the same conclusion as the *Kerry W.* court that even "[i]f the reviewers' conclusions were based on 'substantial evidence,' no such evidence is cited in the explanations they sent to Plaintiffs." *See id.* Therefore, BHO's decision is arbitrary and capricious because it lacks "any analysis, let alone a reasoned analysis" and the claims reviewers' explanations "contain

nothing more than conclusory statements." *See McMillan*, 746 Fed. App'x at 706 (emphasis omitted).

### (ii)    Failure to Consider Contrary Evidence

Second, BHO's decision was arbitrary and capricious because the adverse benefits determination letters show that BHO reviewers ignored substantial contrary evidence in the record that weighs in favor of the medical necessity of RTC care for Amanda's conditions. The court must view the substantiality of the evidence supporting the administrator's denial "based upon the record as a whole," by "tak[ing] into account whatever in the record fairly detracts from its weight." *Caldwell*, 287 F.3d at 1282 (citations and internal quotation marks omitted). Claims administrators cannot "cherry-pick[] the information helpful to [their] decision to deny" benefits, *Rasenack*, 585 F.3d at 1326, and then "shut their eyes to readily available information" that "might confirm the beneficiary's theory of entitlement" to benefits, *Gaither*, 394 F.3d at 807. Doing so indicates that the administrator's denial of benefits is the product of an arbitrary decision rather than a reasoned and principled process. *See Caldwell*, 287 F.3d at 1284 (finding that a denial of benefits was arbitrary and capricious because the claims "administrator . . . ignored evidence that was relevant to her decision" and "based her decision on a skewed reading of [the claimant's] medical records"); *James F.*, 2010 WL 5395075, at *6 (reversing a denial of benefits because the administrator "appears to have selectively reviewed the medical information and ignored relevant evidence"). Here, BHO's denial letters arbitrarily cherry-picked information in the record and ignored substantial evidence that contradicts its decision.

Evidence that Amanda's symptoms reflected intermittent progress does not equate to substantial evidence that RTC care was not medically necessary to treat her symptoms and underlying conditions. *See Alice F.*, 367 F. Supp. 3d at 833 (ruling that "the mere incidence of some improvement does not mean treatment was no longer medically necessary"). As Plaintiffs

argue, the fact that at times "during her treatment Amanda 'seemed to be in a good mood,' or 'seemed to have fun,' or 'seemed to be actually social and smiling a ton,' are not reliable indicia that Amanda did not qualify for continued treatment according to the terms of the Plan." ECF No. 38 at 17. Rather, BHO has ignored ample evidence of Amanda's persistent struggle to manage and consistently improve her mental health disorders throughout her time at New Haven. The examples in the record are numerous.[11] To list a few:

- A January 21, 2016 psychiatric note records "Amanda's increased depression & [suicidal ideation] the last couple w[eeks]." REC 1471.
- On February 9, 2016, an individual psychiatric therapy note states that Amanda "ha[d] a feeling of depression and like she doesn't matter in the world." REC 1348.
- On February 22, 2016, Amanda explained in family therapy that "she shuts down to avoid feeling all emotions and what she does to distract herself from feeling emotions because some emotions like shame are too hard for her to feel." REC 1262.
- On March 7, 2016, she "said she was feeling overwhelmed, frustrated, sad, upset, [and] disappointed." REC 1169.
- On March 17, 2016, Amanda indicated in a family therapy session that she "wanted to protect [her father] from how messed up she is on the inside." REC 3887.
- On April 14, 2016, New Haven staff identified that Amanda's "mood [was] down" and she talked to her therapist about her "depression and sadness" and her "not understanding why she feels this way." REC 3708, 3710.
- On May 31, 2016, Amanda reported feeling "down," "isolated," and "shameful." REC 3453–54.
- On August 18, 2016, New Haven staff noted that Amanda had "no [suicidal ideation] but more mood swings since being off Celexa," an antidepressant, that her "[d]epressive episodes can last up to 2 [days]," and that she "[s]eeks support." REC 2977.
- On September 1, 2016, the record shows that Amanda was "[h]aving a hard time coming off med[ications]," experienced "'[c]razy' mood swings every day," and was "[h]ypersensitive." REC 2895.

---

[11] The court finds at least sixty-three instances in the record spanning nearly the entirety of Amanda's treatment at New Haven that weigh against BHO's conclusory lack of medical necessity decision. *See, e.g.*, REC 1149, 1169, 1182, 1189, 1193, 1199, 1204, 1208, 1228, 1229, 1259, 1262, 1306, 1323, 1333, 1346, 1348, 1352, 1371, 1382, 1385, 1389, 1419, 1437, 1451, 1455, 1471, 1480, 2895, 2920, 2942, 2949, 2957, 2968, 2969, 2970, 2974, 2975, 2977, 2981, 2996, 3003, 3007, 3100, 3161, 3181, 3183, 3202, 3217, 3368, 3453, 3454, 3563, 3570, 3602, 3603, 3625, 3708, 3710, 3811, 3812, 3856, 3887. Although BHO has pointed to purportedly contrary evidence in the record during this litigation, *see* ECF No. 24 at 17–18, BHO's claims reviewers made no similar references during the administrative process. On remand, BHO is advised to consider the record as a whole and avoid presenting a one-sided view of Amanda's condition at New Haven.

Plaintiffs directed BHO to many of these portions of the record in their administrative appeals, *see* REC 1520–21, but BHO's denial letters failed to address this evidence, *see* REC 0336, 0340. Doing so indicates that BHO's denial letters offered a one-sided, cherry-picked version of events that did not consider evidence that fairly detracts from BHO's conclusion that RTC care was not medically necessary to treat Amanda's conditions. These inadequacies demonstrate that BHO's decision to deny benefits was arbitrary and capricious. *See, e.g.*, *Rasenack*, 585 F.3d at 1136; *Caldwell*, 287 F.3d at 1282; *Gaither*, 394 F.3d at 807.

In addition, BHO's decision ignored the diagnoses and treatment recommendations of Amanda's treating physicians. Although "[n]othing in [ERISA] . . . suggests that plan administrators must accord special deference to the opinions of treating physicians," administrators also "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan v. Nord.*, 538 U.S. 822, 831, 834 (2003). In other words, the opinions of treating physicians "may not be ignored, especially when treating physicians—in contrast to reviewers evaluating a medical file—have 'a greater opportunity to know and observe the patient as an individual.'" *Dewsnup v. Unum Life Ins. Co. of Am.*, No. 2:17-CV-00126-TC, 2018 WL 6478886, at *10 (D. Utah Dec. 10, 2018) (unpublished) (quoting *Nord*, 538 U.S. at 832). Moreover, "it may be unreasonable for the administrator to credit the opinion of its own doctor who reviewed records over opinions by treating physicians without sufficient explanation." *West v. Aetna Life Ins. Co.*, No. 115CV00379LTBMEH, 2018 WL 858747, at *10 (D. Colo. Feb. 14, 2018) (unpublished) (citing *Rasenack*, 585 F.3d at 1325–26).

Amanda's treating physicians documented her significant and lasting poor mental health conditions and symptoms. First, on November 25, 2015 (less than one month before her admission to New Haven), Amanda's outpatient therapist, Shaylene Peninger, opined that Amanda "will

benefit from inpatient residential treatment." REC 1566. Ms. Peninger observed that outpatient treatment was insufficient to treat Amanda's "symptoms associated with depression and PTSD" that had "exacerbated . . . over the past few months," including "increases in self-harm (cutting on her legs), and impulsive behaviors (running away from home for days at a time without contacting family or having a place to stay)." *Id.* Ms. Peninger concluded that "[a] higher level of care would ensure that she receive more intensive treatment and structure . . . as outpatient treatment is not able to give her the amount of care that she needs at this time." *Id.*

Second, Michael Guymon, a licensed clinical social worker employed by the State of Idaho, also evaluated Amanda's psychological condition on November 19, 2015. REC 1574. Mr. Guymon reported that Amanda had recent symptoms of depression, attention problems and impulsivity, anxiety, "suicidal threats/self-harm," and adverse effects from trauma. REC 1576–77. After evaluating Amanda and her records, Mr. Guymon concluded that she met the criteria to be diagnosed with "Posttraumatic Stress Disorder," "Major Depressive Disorder," "Conduct Disorder," "Personality Disorder," and "Alcohol Use Disorder." REC 1582. Accordingly, Mr. Guymon evaluated the family's intent to enroll Amanda in an RTC program and "endorsed this plan as viable to address the needs" of Amanda and her family. REC 1583.

Third, upon admission to New Haven, clinical psychologist Dr. Brett Merrill conducted three psychological evaluations of Amanda between December 22, 2015, and February 1, 2016. *See* REC 3938. Concerning her anxiety, Dr. Merrill reported that Amanda displayed symptoms consistent with her feeling "emotionally numb, fatigue, feeling helpless, low energy" and had "trouble concentrating and difficulty sitting still in class." REC 3939. Concerning Amanda's depression, Dr. Merrill reported that Amanda "believed she had been depressed since age four, when her mother committed suicide," she "suffers from feeling guilty, ashamed and despondent,"

45

and that her condition was consistent with her statement that "her depression is 'always there'" and she does not have "breaks from her depression for more than 'an hour.'" REC 3939, 3943–44. As to her history of trauma, Dr. Merrill summarized that Amanda reported she "startles easily," is often "fearful," and has "unwanted thoughts," including of self-harm. REC 3939. As a result, Dr. Merrill stated that although Amanda has "made some excellent progress to heal from her traumatic experiences," she still "struggles with emotional control, overreacting to small problems and having anger outbursts," and her treatment must "address this area of her life from a 'maintenance' point of view." REC 3946–47. Overall, Dr. Merrill concluded that "residential treatment is warranted and recommended" and Amanda's "suicidal ideation and self-harming behaviors should be carefully monitored." REC 3946. On January 16, 2016, the New Haven treatment team developed the Master Treatment Plan for Amanda that identified her diagnoses and treatment objectives. REC 3931. The treatment plan listed Amanda's mental health diagnoses as "Depressive Disorders," "Substance Use and Addictive Disorders," "Disruptive, Impulse Control and Conduct Disorders," "Personality Disorders," and "Trauma and Stressor Related Disorders." *Id.*

BHO reviewers' internal notes reveals it recognized that both of Amanda's "treating therapist and [educational] consultant" recommended she receive RTC care for her conditions. REC 0225. And during their level one and level two appeals, Plaintiffs attached all of this information from treating physicians to their appeals for BHO's consideration. REC 1519–20, 1502–03. But BHO's reviewers neither discussed this information nor specified any other reliable evidence to refute the opinions of Amanda's treating physicians. *See* REC 0336, 0340. Indeed, as discussed above, BHO reviewers cited no evidence at all and throughout the claims review process only repeated conclusory statements that Amanda's condition had purportedly improved and a lower level of outpatient treatment would be effective.

The Plan states that "[e]ven though a clinician may prescribe, order, recommend or approve a service or supply, it doesn't mean that it's medically necessary. [BHO] . . . determines if a service or supply is medically necessary." REC 0086, 0213. But BHO's repeated failures to consider contrary medical evidence in the record and from Amanda's care providers violates the Supreme Court's admonition that claims administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *See Nord*, 538 U.S. at 834. Because BHO's denial letters do not indicate whether BHO analyzed the record or the opinions of Amanda's treating physicians at all, BHO's denial of benefits is arbitrary and capricious.

### B.  REMEDY

Plaintiffs seek a retroactive reinstatement of benefits, prejudgment interest, and attorney's fees and costs. But the court's determination that BHO's denial of benefits was arbitrary and capricious "does not automatically entitle Plaintiffs to the remedy they seek." *See Michael D. v. Anthem Health Plans of Kentucky, Inc.*, 369 F. Supp. 3d 1159, 1178 (D. Utah 2019), *appeal dismissed sub nom. Michael D. v. Anthem Health Plans of Kentucky*, No. 19-4033, 2019 WL 4316863 (10th Cir. Apr. 29, 2019). Instead, the court determines that reversal and remand is the appropriate remedy in this case. Accordingly, the court declines to award prejudgment interest to Plaintiffs but agrees that Plaintiffs' counsel is entitled to attorney's fees and costs.

### 1.  Reversal and Remand

Reversal and remand to the claims administrator is warranted in this case. "[W]hen a reviewing court concludes that a plan administrator has acted arbitrarily and capriciously in handling a claim for benefits, it can either remand the case to the administrator for a renewed evaluation of the claimant's case, or it can award a retroactive reinstatement of benefits." *DeGrado v. Jefferson Pilot Fin. Ins. Co.*, 451 F.3d 1161, 1175 (10th Cir. 2006) (citations and internal quotation marks omitted). But the proper "remedy when an ERISA administrator fails to make

adequate findings or to explain adequately the grounds of her decision is to remand the case to the administrator for further findings or explanation." *Caldwell*, 287 F.3d at 1288. Here, the court rules that BHO's decision to deny benefits was arbitrary and capricious because of the inadequacies in BHO adherence to the Plan and lack of adequate findings and explanations based on the record. Accordingly, reversal and remand to the claims administrator is appropriate in this case. On remand, BHO is required to reconsider its denial of benefits consistent with this decision, including by: (1) correcting the identified serious procedural irregularities; (2) addressing the medical necessity of Amanda's substance abuse treatment; (3) applying criteria to evaluate Amanda's diagnoses, conditions, and symptoms that are consistent with the Plan's definition of RTC care as subacute; (4) offering a reasoned analysis by applying appropriate medical necessity criteria to identified facts in the record concerning Amanda's circumstances; and (5) considering contrary medical evidence, including the opinions of Amanda's treating physicians.

### 2. Prejudgment Interest

In an ERISA matter, "[p]rejudgment interest is . . . available in the court's discretion." *Weber*, 541 F.3d at 1016 (quotations omitted). Because the court has remanded to the claims administrator and has not awarded a reinstatement of benefits, the court will not award prejudgment interest. *See Michael D.*, 369 F. Supp. 3d at 1179.

### 3. Attorney's Fees and Costs

In ERISA cases, the court "in its discretion may allow a reasonable attorney's fee and costs of action," 29 U.S.C. § 1132(g)(1), when a "claimant has achieved some degree of success on the merits," *Cardoza v. United of Omaha Life Ins. Co.*, 708 F.3d 1196, 1207 (10th Cir. 2013) (citation and internal quotation marks omitted). Factors to guide the court's discretion are:

> (1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of fees; (3) whether an award of fees would deter others from acting under similar

> circumstances; (4) whether the party requesting fees sought to
> benefit all participants and beneficiaries of an ERISA plan or to
> resolve a significant legal question regarding ERISA; and (5) the
> relative merits of the parties' positions.

*Id.* "No single factor is dispositive and a court need not consider every factor in every case." *Id.*

Concerning costs, 28 U.S.C. § 1920 sets forth the items that may be recovered as costs in an ERISA

action. *See Allison v. BankOne–Denver*, 289 F.3d 1223, 1243–44 (10th Cir. 2002). The court "has

no discretion to award items as costs that are not set out in section 1920." *Sorbo v. United Parcel*

*Service*, 432 F.3d 1169, 1179 (10th Cir. 2005) (quotation omitted).

  In this case, Plaintiffs have achieved some success on the merits to warrant an award of

attorney's fees and costs. Although the court has not ruled that BHO acted in bad faith in denying

benefits, BHO was culpable in failing to properly evaluate Plaintiffs' claim for benefits and

committed serious procedural irregularities during its claims review process. BHO also has the

ability to satisfy an award of fees. Moreover, an award of fees should encourage BHO to follow

ERISA's minimum procedural regulations and engage in a "meaningful dialogue" with claimants

in the future. *See, e.g.*, *Michael D.*, 369 F. Supp. 3d at 1179 (discussing deterrence factor); *James*

*F. ex rel. C.F. v. CIGNA Behavioral Health, Inc.*, No. 1:09CV70 DAK, 2011 WL 2441900, at *2

(D. Utah June 15, 2011) (unpublished) (same). The court also considers that Plaintiffs have proven

multiple grounds on which BHO's denial of benefits was arbitrary and capricious, further

supporting the relative merits of its position and counseling in favor of an award of fees. For these

reasons, the court will award appropriate attorneys' fees to Plaintiffs for work performed by

Plaintiffs' counsel and costs as defined by 28 U.S.C. § 1920. Within twenty-one days of this order,

Plaintiffs' counsel should submit a petition for attorney's fees and costs, including an affidavit

indicating a calculation of fees with an accounting of time and costs.

## IV.    ORDER

For the foregoing reasons, the court **DENIES** Defendants' Motion For Summary Judgment

and **GRANTS IN PART** Plaintiffs' Motion For Summary Judgment. Specifically:

1. Defendants' Motion for Summary Judgment (ECF No. 24) on BHO's decision to deny

   benefits for Plaintiffs' treatment at New Haven is DENIED;

2. Plaintiffs' Motion for Summary Judgment (ECF No. 27) on whether BHO's decision to

   deny benefits for Plaintiffs' treatment at New Haven was arbitrary and capricious is

   GRANTED IN PART;

3. Plaintiffs' request for prejudgment interest is DENIED;

4. Plaintiffs' request for attorney's fees and costs is GRANTED. Plaintiffs' counsel should

   submit its petition for fees and costs within twenty-one (21) days of this order; AND,

5. The court ORDERS that BHO's denial of benefits is REVERSED and that this case is

   REMANDED to BHO for further proceedings consistent with this decision.


Signed May 29, 2020

                                    BY THE COURT:

                                    _____
                                    Jill N. Parrish
                                    United States District Court Judge

50